**OREGON ENVIRONMENTAL COUNCIL
and the Sierra Club, Plaintiffs,**

v.

**OREGON DEPARTMENT OF ENVIRON-
MENTAL QUALITY and Fred Hanson,
Director, Defendants.**

Civ. No. 91–13–FR.

United States District Court,
D. Oregon.

Sept. 27, 1991.

David Paul, Portland, Or., Victor M. Sher, Todd D. True, Sierra Club Legal Defense Fund, John B. Arum, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, Wash., for plaintiffs.

Dave Frohnmayer, Atty. Gen., Denise G. Fjordbeck, Asst. Atty. Gen., Salem, Or., Shelley K. McIntyre, Asst. Atty. Gen., Portland, Or., for defendants.

## OPINION

FRYE, District Judge:

The matters before the court are:

1) the motion of defendants, the Oregon Department of Environmental Quality and Fred Hanson, Director (collectively, the DEQ), to dismiss the complaint of plaintiffs, the Oregon Environmental Council and the Sierra Club (# 13);

2) the motion of the DEQ for partial summary judgment (# 37);

3) the motions of Freightliner Corporation, Precision Castparts Corporation and Tektronix, Inc. (# 15); Simpson Timber Co. (# 20); and Gunderson, Inc. (# 28–1) (collectively, the applicants for intervention) to intervene; and

4) the motions of Freightliner Corporation, Precision Castparts Corporation and Tektronix, Inc. (# 18); Simpson Timber Co. (# 23); and Gunderson, Inc. (# 28–2) to dismiss the complaint of plaintiffs.

## BACKGROUND

Pursuant to the Clean Air Act, 42 U.S.C. §§ 7401 et seq., the Environmental Protection Agency (EPA) is charged with setting primary air quality standards for certain pollutants in order to protect the public health. 42 U.S.C. § 7409(b)(1). The EPA is also charged with setting secondary air quality standards for certain pollutants in order to protect the public welfare. 42 U.S.C. § 7409(b)(2).

Ozone is one of the pollutants for which the EPA has established primary and secondary standards pursuant to the Clean Air Act. Ozone is a pollutant which is the chemical combination of two other pollutants, oxides of nitrogen and hydrocarbons, which are sometimes referred to as volatile organic compounds. The EPA has set the national ambient air quality primary and secondary standards for ozone at 0.12 parts per million. This standard is attained when the expected number of days per calendar year that the maximum hourly concentrations of ozone exceeds 0.12 parts per million is equal to or less than one. 40 C.F.R. § 50.9 (1988).

Ozone concentrations in the atmosphere can only be reduced by reducing the emission of volatile organic compounds. Emission of volatile organic compounds by various industries is a major source of ozone. Volatile organic compounds are emitted as by-products of processes, such as paper and can coating, metal painting, and the degreasing and cleaning that occurs in the manufacture of computer chips.

The Clean Air Act provides that states are responsible for preparing their own implementation plans for achieving and maintaining the air quality standards set by the EPA. 42 U.S.C. § 7410(a)(1). The states are required to submit their implementation plans to the EPA for approval. Id. The EPA may approve an implementation plan submitted by a state only if the plan meets all of the requirements of the Clean Air Act. 42 U.S.C. §§ 7410(a)(3)(A), 7502(b). Following the approval of the EPA of a state implementation plan, the requirements and commitments contained therein are binding as a matter of federal law upon the state unless and until the state submits a formal revision of its implementation plan that is approved by the EPA. 42 U.S.C. § 7413(a)(2); American Lung Ass'n of New Jersey v. Kean, 871 F.2d 319, 322 (3d Cir.1989).

In 1977, Congress amended the Clean Air Act to include more stringent requirements for those geographical areas that had failed to meet federal standards (nonattainment areas) for pollution control. Pub.L. 95–95; 42 U.S.C. §§ 7501–08. The amendment to the Clean Air Act required states that had not yet attained the limits set by the EPA to submit revised implementation plans to the EPA. 42 U.S.C. § 7502. The revised implementation plans were to in-

clude all reasonably available control measures and meet all requirements set out in 42 U.S.C. § 7410(a)(2)(I). The states were instructed by the EPA to provide in their implementation plans for reductions in emissions sufficient to demonstrate that the primary standard for ozone would be achieved as expeditiously as practicable, but not later than December 31, 1987. 42 U.S.C. §§ 7502(a)(2) and (c).

Section 7502(c)(1) provides, in part, that implementation plans provide for reductions in emissions from existing sources through the adoption of "reasonably available control technology." 42 U.S.C. § 7502(c)(1), formerly codified at 42 U.S.C. § 7502(b)(2). The EPA publishes control technology guidelines that set technology-based numerical limits on emissions of volatile organic compounds from various manufacturing processes and define reasonably available control technology in terms of emission rates for each process. 45 Fed. Reg. at 42,269.

Section 7502(c)(1) also requires an implementation plan to establish a permit program to regulate the construction and operation of major, new or modified sources of emissions. 42 U.S.C. § 7502(c)(4), formerly codified at 42 U.S.C. § 7502(b)(5). Under this system of "new source review," states may issue a permit for the construction of a proposed, major, new or modified source of pollutant emissions only if the state requires the source of the emission to comply with the lowest achievable emission rate. 42 U.S.C. § 7503(a)(2). Prior to issuing a permit to a new source, the state must require an analysis of alternative sites, sizes, production processes, and environmental control techniques for the proposed source that demonstrates that the benefits of the proposed source significantly outweigh its environmental and social costs. 42 U.S.C. § 7502(b)(11)(A), now codified at 42 U.S.C. § 7503(a)(5). If the Administrator of the EPA determines that the provisions of an approved implementation plan are not being properly implemented in issuing a permit to a new source, the state cannot issue the permit. 42 U.S.C. § 7503(a)(4).

The DEQ is the agency responsible for meeting the obligations imposed upon the State of Oregon by the Clean Air Act. In 1973, the DEQ submitted an implementation plan for the State of Oregon, and the EPA approved the implementation plan. On March 3, 1978, the EPA designated the Portland–Vancouver metropolitan area a "nonattainment area" with respect to concentrations of ozone pursuant to 42 U.S.C. § 7407(d). This designation remains in effect.

On June 29, 1979, the State of Oregon submitted a revised implementation plan for the area of the state in and around the City of Portland in order to address the problem of nonattainment. In the revised implementation plan, the DEQ argued that despite the implementation of reasonably available control measures, it did not believe that the State of Oregon could meet the standards set by the EPA by December 31, 1982. On July 20, 1982, the DEQ submitted a revised implementation plan to the EPA as required by the 1977 amendments to the Clean Air Act. This revised implementation plan was approved by the EPA and is in effect today.

The implementation plan in effect for the State of Oregon contains a general emissions standard that provides as follows:

Notwithstanding the general and specific emission standards and regulations contained in this Division, the highest and best practicable treatment and control of air contaminant emissions shall in every case be provided so as to maintain overall air quality at the highest possible levels, and to maintain contaminant concentrations ... and other deleterious factors at the lowest possible levels. In the case of new sources of air contamination ... the degree of treatment and control provided shall be such that degradation of existing air quality is minimized to the greatest extent possible.

O.A.R. 340–20–001.

The implementation plan also contains specific measures to control emissions of volatile organic compounds in the ozone nonattainment area in and around the City of Portland. Pursuant to section 7502, the implementation plan requires that reasonably available control technology be applied

to all sources of volatile organic compounds for which the EPA has published a control technology guideline. Specifically, the implementation plan states: "The Department of Environmental Quality has adopted emission standards that require reasonably available control technology to be applied to all sources of volatile organic compounds for which EPA has published control technology guidelines." State Implementation Plan for the State of Oregon, p. 45.

The implementation plan provides that compliance with the standards for emissions of volatile organic compounds is required by the end of the year 1982.

The implementation plan also provides that to qualify for a new source permit, a source must comply with the lowest achievable emission rate, obtain offsets or a growth increment, and prepare an alternatives analysis. The implementation plan establishes a permit program for all existing stationary sources of air contaminants. All persons constructing or operating a stationary source must obtain a permit from the DEQ. The permit must include overall numerical emission limits based on a baseline emission rate that is the average emission rate for the years 1977 or 1978. Plant site emission limits must be established on a short-term period emission basis that is compatible with source operation and air quality standards.

The Portland metropolitan area failed to attain the national standards for ozone concentrations by the end of 1987 as required by the Clean Air Act. The Portland metropolitan area has failed to attain the national standards for ozone concentrations at this time.

This is an action under the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* Pursuant to 42 U.S.C. § 7604, private parties, following sixty days written notice, may file actions in federal court against state agencies that fail to carry out mandatory commitments under an applicable implementation plan.

## MOTIONS TO INTERVENE

Each of the applicants for intervention engage in activities that result in the emissions of volatile organic compounds and, thus, contribute to the concentration of ozone in the atmosphere. Each of the applicants for intervention carry out these activities pursuant to a permit issued by the DEQ or pursuant to an exemption from a requirement provided for by the implementation plan which was approved by the DEQ. Plaintiffs claim that the permits and exemptions granted to the applicants for intervention are among those that are in violation of the implementation plan and therefore violate federal law.

### 1. Intervention as a Matter of Right

■ The Ninth Circuit uses a four-part test to decide applications to intervene as a matter of right under Fed.R.Civ.P. 24(a)(2):

1) the motion of the applicant must be timely filed;

2) the applicant must assert an interest relating to the property or transaction that is the subject of the action;

3) the applicant must be so situated that without being allowed to intervene, the disposition of the action may, as a practical matter, impair or impede the ability of the applicant to protect that interest; and

4) the interest of the applicant may not be adequately represented by the existing parties. *Portland Audubon Soc'y v. Hodel*, 866 F.2d 302, 308 (9th Cir.1989).

The court will address each of these factors separately.

### A. *Timeliness*

■ The Ninth Circuit considers three factors in evaluating the timeliness of a motion to intervene: 1) the stage of the proceeding; 2) the prejudice to other parties; and 3) the reason for and length of delay in filing the motion to intervene. *United States v. Oregon*, 913 F.2d 576, 588 (9th Cir.1990).

■ No discovery has taken place in this case; no significant negotiations between the parties has occurred; and the applicants for intervention and the DEQ have raised an issue concerning the jurisdiction

of this court to hear this dispute in a motion to dismiss the complaint. Furthermore, plaintiffs do not contend that the motions to intervene are not timely filed. Under these circumstances, the court finds that the motions to intervene have been timely filed.

### B. *The Interests of the Intervenors*

■ To have a right to intervene, an applicant must establish a direct, significant, legally-protectable interest in the transaction that is the subject of the case. *Portland Audubon,* 866 F.2d at 309.

*Portland Audubon* is the controlling case. In *Portland Audubon,* the Ninth Circuit held that an association of timber companies and independent contractors did not have a right to intervene in an action brought under the National Environmental Policy Act (NEPA) to challenge the sale of timber from federal lands. *Id.* at 308–09. The court held that while the applicants for intervention had a significant economic stake in the outcome of the case, that interest was not protectable under NEPA because NEPA provides protection only for environmental interests rather than the purely economic interests asserted by the applicants for intervention. *Id.* at 309.

■ The mandate of the Clean Air Act is the attainment of national ambient air quality standards "as expeditiously as practicable." 42 U.S.C. § 7502(a)(2). In so doing, Congress wanted to "foreclose the claims of emission sources that it would be economically or technologically infeasible for them to achieve emission limitations sufficient to protect the public health within the specified time." *Union Elec. Co. v. EPA,* 427 U.S. 246, 258, 96 S.Ct. 2518, 2526, 49 L.Ed.2d 474 (1976). 42 U.S.C. § 7502(a). The Act does not provide direct protection for the economic interests of industries that emit pollutants.

The applicants for intervention contend that they have more than an economic interest in the outcome of this litigation. The applicants explain that once permits are granted, they must apply control equipment and process changes to tailor their individual operations to conform with the terms and conditions of their permits. So stated, the interest of the applicants for intervention in protecting their existing permits, like the interest identified by the applicants in *Portland Audubon,* is purely economic and is not protectable under the Clean Air Act.

The focus of this litigation is whether the DEQ, charged with administering the implementation plan, has followed the procedures and met the requirements set forth in the implementation plan for issuing permits and exemptions. In such a suit, "brought to require compliance with federal statutes regulating governmental projects, the governmental bodies charged with compliance can be the only defendants." *Portland Audubon,* 866 F.2d at 309, *quoting Wade v. Goldschmidt,* 673 F.2d 182, 185 (7th Cir.1982).

This case is analogous to *Portland Audubon* and *Wade.* The applicants for intervention have failed to establish that they have a legally-protectable interest in the subject of this litigation.

### C. *Impairment of the Interests of the Applicants*

Plaintiffs do not attack the validity of the individual permits under which the applicants for intervention operate. Rather, plaintiffs seek an order requiring the DEQ to comply with the Clean Air Act by enforcing the terms of the implementation plan in issuing permits. Because the court finds that the interests of the applicants for intervention in the outcome of this litigation is not directly related to the litigation, any impairment of their economic interests is insufficient to give rise to a right to intervene. *Wade v. Goldschmidt,* 673 F.2d at 186.

### D. *Adequacy of Representation*

■ An applicant for intervention has the burden to demonstrate that its interests may not be adequately represented by the existing parties to the suit. *Blake v. Pallan,* 554 F.2d 947, 954 (9th Cir.1977); *Sagebrush Rebellion, Inc. v. Watt,* 713 F.2d 525, 528 (9th Cir.1983). The Ninth Circuit uses three factors to determine the adequacy of representation: 1) whether the

interest of a present party is such that the party will undoubtedly raise the same arguments as the intervenor; 2) whether the present party is capable and willing to make such arguments; and 3) whether the intervenor would offer any necessary elements to the proceedings that the existing parties would neglect. *California v. Tahoe Regional Planning Agency,* 792 F.2d 775, 778 (9th Cir.1986).

■ Where the intervenor and an existing party have the same ultimate objective, a presumption of adequacy of representation arises. *American Nat'l Bank and Trust Co. of Chicago v. City of Chicago,* 865 F.2d 144, 148 n. 3 (7th Cir.1989). The objective of the DEQ and the objective of the applicants for intervention is the same—i.e., the preservation of the policies and procedures that resulted in the issuance of the permits to the applicants for intervention and other permitees in the geographical area in and around the City of Portland.

The applicants for intervention contend that the DEQ may not adequately represent their interests because 1) the DEQ may not make all of the arguments pertaining to the terms and conditions of the individual permits that would be made by the permittees; 2) the DEQ may not have the same incentive to protect the specific terms written into the individual permits; 3) an explanation of the technical aspects of the operations of each applicant, as reflected in the permit of the applicant, will require the technical expertise of the applicant.

These arguments, however, misconstrue the nature of this litigation. The court will not be scrutinizing the individual permits issued by the DEQ to determine if a corporation is complying with the terms of its permit. The issue to be decided by this court is whether the DEQ is interpreting and applying the terms of the implementation plan for the State of Oregon in the manner that is required by the Clean Air Act. The individual permits issued by the DEQ pursuant to its interpretation of the implementation plan, though they may be admissible as evidence, are not the focus of this litigation.

■ The interest of a putative intervenor is not inadequately represented by a party to a lawsuit simply because the party to the lawsuit has a motive to litigate that is different from the motive to litigate of the intervenor. *Natural Resources Defense Council, Inc. v. New York State Dept. of Envtl. Conservation,* 834 F.2d 60, 61–62 (2d Cir.1987). A review of the pleadings and the motions filed in this case demonstrates the areas of common interest between the DEQ and the applicants for intervention, as well as the keen interest and able advocacy of the DEQ in defending this action. The court finds that the applicants for intervention have not demonstrated that the DEQ is incapable or unwilling to make all available arguments in support of their common objectives, or that the applicants will contribute some element necessary to the adjudication of this case that would otherwise be omitted.

■ Because the court finds that the applicants for intervention do not have a protectable interest in the outcome of this litigation or an interest that will be directly affected by the outcome of the litigation, and because the remaining interests of the applicants are adequately represented by the DEQ, the applicants are not entitled to intervene as a matter of right.

### 2. Permissive Intervention

■ The question essential to determining whether intervention should be permitted is whether it would "unduly delay or prejudice the adjudication of the rights of the original parties." Fed.R.Civ.P. 24(b)(2). The Ninth Circuit will allow permissive intervention when the intervenor raises a claim that has questions of law or fact in common with the main case, shows independent grounds, and moves for intervention in a timely fashion. *Garza v. County of Los Angeles,* 918 F.2d 763, 777 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991).

In determining whether common questions of law or fact exist, a court will look to whether the intervenor would contribute to a full development of the underlying issues in the suit. *Northern Spotted Owl v. Hodel,* 19 Envtl.L.Rep. 20,275. The ap-

plicants for intervention contend that they can contribute to this litigation by providing information about their individual permits. However, as discussed above, specific information regarding the intricacies of the operations of the applicants is not necessary to the litigation of this action.

■ Where proposed intervenors would present no new questions to the court, conferring amicus status is generally preferred over a grant of permissive intervention. *See Bush v. Viterna,* 740 F.2d 350, 359 (5th Cir.1984).

■ The applicants for intervention do not identify any grounds, independent of the grounds asserted by the parties to the case, upon which they should be permitted to intervene.

As discussed above, the applications for intervention have been timely filed.

The court finds the reasoning of the Eleventh Circuit in *Manasota–88, Inc. v. Tidwell,* 896 F.2d 1318 (11th Cir.1990), persuasive on this issue. In *Manasota–88,* the court upheld denial of permissive intervention to a non-profit association of electrical generating facilities in a citizen's suit to compel the EPA to comply with the requirements of the Clean Water Act. The court stated:

> Plaintiff commenced this action to hasten compliance with the Clean Water Act, and intervention by FCG would severely protract the litigation. Although we express no opinion as to the merits of plaintiff's claims, an action which seeks to preserve the environment from further deterioration deserves refuge from the undue delay that would result from appellant's intervention.

*Id.* at 1323.

The applicants' motion for permissive intervention is denied.

## THE MOTION OF THE DEQ TO DISMISS

The DEQ contends that the complaint of the plaintiffs should be dismissed because 1) this court lacks subject matter jurisdiction; and 2) plaintiffs fail to state a claim upon which relief can be granted.

## *Allegations of the Complaint*

Plaintiffs allege that the DEQ is violating the implementation plan for the State of Oregon and the Clean Air Act by:

1) failing to provide for the "highest and best practicable treatment and control" in all cases involving emissions of volatile organic compounds in the Portland nonattainment area. Specifically, the DEQ has failed a) to require compliance with reasonably available control technology emission standards and limitations; b) to enforce new source review rules; c) to define and enforce reasonably available control technology emission standards and limitations for manufacturing processes for which the EPA has not published control technology guidelines; and d) to require the Simpson Timber Company to employ the highest and best treatment and control of emissions of volatile organic compounds from a new paper coating line that contributes over 600 tons of volatile organic compounds annually to the Portland airshed;

2) failing to enforce mandated, reasonably-available control technology emission standards and limitations set in the implementation plan at major sources of volatile organic compounds in the Portland nonattainment area, including, but not limited to: Simpson Timber Co., Gunderson, Inc., Freightliner Corp., Silgan Containers Corp., and Continental Can Co. The DEQ has issued permits to these sources that allow them to exceed emission standards and limitations mandated by the implementation plan and that substitute less stringent limits not authorized by the implementation plan;

3) granting permit applicants the right to operate major new or modified sources of volatile organic compounds without requiring compliance with the new source review requirements mandated by the implementation plan; and

4) failing to provide for and enforce short-term plant site emission limits for emissions of volatile organic compounds as required by the implementation plan, allowing sources to demonstrate compliance with hourly or daily plant site emission limits by dividing the total annual emissions of volatile organic compounds by the number of hours or days the plant operated in that

year, a system that is inconsistent with the hourly federal air quality standard for ozone and contrary to the requirements of the implementation plan.

### Applicable Standard

■■■ A motion to dismiss under Rule 12(b)(6) will only be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Gibson v. United States,* 781 F.2d 1334, 1337 (9th Cir.1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987). The review is limited to the complaint, and all allegations of material fact are taken as true and viewed in the light most favorable to the non-moving party. *Cassettari v. Nevada County, Cal.,* 824 F.2d 735, 737 (9th Cir.1987).

### Analysis and Ruling

In support of its motion to dismiss, the DEQ first argues that this court does not have jurisdiction to hear this dispute because 1) 42 U.S.C. § 7604(a) permits suits only against operators of pollution sources, not state agencies acting as regulators, except where the alleged failure to regulate involves regulations specifically listed in section 42 U.S.C. § 7604(f). The DEQ contends that since the plaintiffs have not alleged the violation of an emission standard or limitation or any other claim actionable under the Clean Air Act for the purposes of establishing jurisdiction in this court, the case must be dismissed. Plaintiffs contend that jurisdiction exists in this court because they have alleged that the DEQ has violated emission standards or limitations within the meaning of the Clean Air Act.

Plaintiffs bring this suit pursuant to 42 U.S.C. § 7604(a)(1), which provides, in part:

> Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf—
>> (1) against any person (including … any … governmental instrumentality or agency …) who is alleged to be in violation of (A) an emission standard or limitation under this chapter.

In 42 U.S.C. § 7604(f), an emission standard or limitation is defined, in part, as "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard," or "any condition or requirement under an applicable implementation plan relating to … air quality maintenance plans … or vapor recovery requirements."

An emission standard or limitation is broadly construed as "any type of control to reduce the amount of emissions into the air." *Citizens for a Better Env't v. Deukmejian,* 731 F.Supp. 1448, 1454 (N.D.Cal.1990), *quoting NRDC v. EPA,* 489 F.2d 390, 394 n. 2 (5th Cir.1974), *rev'd on other grounds sub nom. Train v. NRDC,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

Pursuant to section 7604(f), an air quality maintenance plan is a revision to an implementation plan designed to assure attainment and maintenance of a national ambient air quality standard. 40 C.F.R. § 51.40. Air quality maintenance plans must contain enforceable control measures, enforceable law and regulations, administrative procedures, enforcement methods, and a description of how the control strategy relates to the new source review procedure proposed by the state. 40 C.F.R. § 51.54.

■■■ The air quality maintenance plan for the ozone nonattainment area in and around the City of Portland is contained in the revision of the implementation plan entitled "Control Strategy for Portland–Vancouver Interstate Air Quality Maintenance Area," which was adopted by the DEQ on June 25, 1982. Plaintiffs allege violations of four conditions and requirements that are "related to" the air quality maintenance plan for the area in and around the City of Portland: 1) the reasonably available control technology requirement; 2) the new source review requirement; 3) the application of the plant site emissions limitations guidelines; and 4) the highest and most practicable treatment and control rule. Thus, plaintiffs have established the jurisdiction of this court by alleging violations "relating to" the air quality maintenance plan for the area in and around the

City of Portland within the meaning of 42 U.S.C. § 7604(f).

■ Plaintiffs have established a second basis for this court to exercise jurisdiction by alleging that the DEQ has failed to enforce reasonably available control technology rules set forth in the implementation plan to control emissions of volatile organic compounds at all industrial sources covered by a control technology guideline published by the EPA. Plaintiffs allege that this failure violates not only a requirement relating to the 1982 implementation plan, but also a schedule of compliance set forth in the implementation plan at Table 4.3.3–3 and in O.A.R. 340–22–107.

42 U.S.C. § 7602(p) defines a schedule of compliance as "a schedule of required measures including an enforceable sequence of actions or operations leading to compliance with an emission limitation, other limitation, prohibition, or standard." Table 4.3.3–3 is labeled an "Industrial Source Compliance Schedule" and sets forth a list of sources and required dates of compliance with the rules of the State of Oregon governing emissions of volatile organic compounds. O.A.R. 340–22–107 is entitled "Compliance Schedule Increments of Progress" and sets out mandatory milestones for achieving compliance with the general emission standards set by the State of Oregon. These tables are schedules of compliance as defined by the Clean Air Act in 42 U.S.C. § 7602(p).

■ The third ground upon which plaintiffs have established the jurisdiction of this court is discussed in *American Lung Ass'n of New Jersey v. Kean*, 871 F.2d 319 (3d Cir.1989). In *Kean*, the Third Circuit held that the federal court had jurisdiction to consider a claim that a state regulatory agency failed to carry out the strategies for ozone control that it had committed to enforce in its implementation plan. The court so held because the regulation that plaintiffs sued to enforce related to requirements for vapor recovery, and because section 7604(a) permitted suits against state agencies.

The complaint of the plaintiffs focuses on regulations governing the control of emissions of volatile organic compounds. Volatile means "passing off readily in the form of vapor." Random House College Dictionary at 1474 (1982). Plaintiffs allege that the DEQ has failed to enforce requirements of the implementation plan and the Clean Air Act that relate to the control of vaporized volatile organic compounds from industrial sources. These requirements of the implementation plan and the Clean Air Act are requirements for vapor recovery. *See* O.A.R. 340–22–170(6). Thus, pursuant to *Kean*, plaintiffs have established a third basis for the jurisdiction of this court.

The second argument of the DEQ in support of its motion to dismiss is that plaintiffs have failed to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The DEQ argues that plaintiffs have failed to allege a violation of an emission standard or limitation. Construing the complaint in the light most favorable to plaintiffs, as the court must in a motion under Rule 12(b)(6), the court finds that plaintiffs have stated claims upon which relief can be granted.

### THE MOTION OF THE DEQ FOR PARTIAL SUMMARY JUDGMENT

In this motion, the DEQ moves for summary judgment dismissing each of the claims of plaintiffs on the ground that plaintiffs have failed to exhaust administrative remedies and legal remedies available under the laws of the State of Oregon, and moves to dismiss the first, second and fourth claims for relief of plaintiffs on the grounds that those claims are moot.

#### Uncontested Facts

Pursuant to the 1977 amendments to the Clean Air Act, the State of Oregon submitted to the EPA a revised implementation plan, which was approved by the EPA. Section 3.1 of the implementation plan contains the Oregon Administrative Rules adopted by the Environmental Quality Commission to carry out the requirements of the Clean Air Act.

In 1987, the EPA issued a proposed policy outlining its plans for review and revision of implementation plans in areas that had failed to attain the national ambient air

quality standards. 52 Fed.Reg. 45044 (Nov. 24, 1987). On December 22, 1988, the EPA issued a letter to the DEQ identifying the areas in the implementation plan for the State of Oregon that needed review and possible revision.

The DEQ then began to review and revise its rules relating to the control of volatile organic compounds. Following this review, the DEQ submitted proposed rule changes to the Environmental Quality Commission for adoption.

The permit issued to Silgan Containers Corp. (Silgan), and referred to in plaintiffs' second claim for relief, is based on a 1986 rule change that relaxed the implementation plan by changing the requirements for emissions of volatile organic compounds for end sealing compounds for fatty foods. Although the DEQ submitted this rule change to the EPA as a revision of the implementation plan, the EPA never acted to deny or to approve the change. The DEQ amended the Air Contaminant Discharge Permit issued to Silgan to include the more liberal rule, and the EPA noted this change as an area requiring review.

Silgan recently began using a coating surface that complies with the rule in the approved implementation plan. The DEQ has issued an amended permit to Silgan requiring the use of end sealing compounds that comply with the approved implementation plan for the State of Oregon. The DEQ has proposed a rule change to the Environmental Quality Commission that will bring the Oregon rules back into conformance with the approved implementation plan.

The EPA also identified plant site emission limits as an area needing review in its letter to the DEQ. The DEQ issued amended permits to some sources requiring monitoring and reporting of short-term emissions of volatile organic compounds.

Plaintiffs' first claim for relief alleges that the DEQ has failed to define and then enforce "reasonably available control technology" for manufacturing processes for which the EPA has not published control technology guidelines. The implementation plan approved by the EPA for the State of Oregon does not contain reason-ably available control technology emission standards for non-control technology guideline sources. The EPA raised this issue in its letter to the DEQ. In response to the EPA's letter, the DEQ drafted rules to correct these problems.

*Applicable Standard*

 Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, all reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir.1976).

*Analysis and Ruling*

42 U.S.C. § 7604(b) requires a party to provide notice of its intent to sue to gain enforcement of the provisions of the Clean Air Act at least sixty days before filing suit. Plaintiffs provided notice to the DEQ of their intent to sue nearly 200 days before filing this suit.

Three of the claims of plaintiffs involve the alleged failure by the DEQ to enforce the reasonably available control technology requirement, the short-term plant site emission limitations requirement, and the "highest and best" requirement at existing sources of the Clean Air Act and the implementation plans. Plaintiffs claim that the DEQ is issuing permits to existing sources without requiring maintenance or reduction of emissions that plaintiffs allege are called for by the implementation plan and the Clean Air Act. The DEQ provides no administrative remedy for three out of the four claims of plaintiffs because, as the DEQ admits, it routinely renews or modifies permits held by existing sources with-

out providing any public notice or opportunity to be heard if the renewals do not involve increasing an emission limit or providing for an increase in emissions. Defendant's Memorandum in Support of Motion for Partial Summary Judgment, p. 12; Sims Affidavit, p. 4.

■■■ Exhaustion of administrative remedies is not generally required when the question of the adequacy of the administrative remedy is for all practical purposes identical with the merits of the case. *Barry v. Barchi*, 443 U.S. 55, 63, n. 10, 99 S.Ct. 2642, 2648, n. 10, 61 L.Ed.2d 365 (1979). The fourth and final claim of plaintiffs is that the DEQ has failed to enforce the procedural and substantive requirements of new source review required by the Clean Air Act. In this claim, plaintiffs allege that the administrative remedies provided by the DEQ with respect to its procedure for new source review violate the implementation plan and the Clean Air Act. Under *Barry*, plaintiffs need not exhaust administrative remedies prior to filing this claim.

■■■ The DEQ also argues that the claims of plaintiffs should be dismissed because plaintiffs have failed to exhaust state judicial remedies. In general, the exhaustion requirement does not apply to state judicial as opposed to administrative remedies. *Gibson v. Berryhill*, 411 U.S. 564, 574, n. 13, 93 S.Ct. 1689, 1695–96, n. 13, 36 L.Ed.2d 488 (1973). It would defeat the purpose of Congress for a court to hold that assertion of a federal claim in federal court must await an attempt to vindicate the same claim in a state court. *Id.* The DEQ cites no case in support of its position that plaintiffs must exhaust state judicial remedies before filing an action under 42 U.S.C. § 7604(a), which expressly authorizes citizens' suits in federal court.

Finally, the DEQ argues that a number of the claims of plaintiffs have been rendered moot by remedial actions it has taken since the filing of this action. This argument is based on the DEQ's position that this case calls for a permit by permit review by this court. Thus, the DEQ seeks to have the case declared moot as to those permits that it has now amended in accordance with the implementation plan.

As stated above, this case is not a review of the actions of the DEQ on a permit-by-permit basis. This case concerns the claim of plaintiffs that the DEQ is violating federal law as embodied by the Clean Air Act and the implementation plan for the State of Oregon. To prevail on this claim, plaintiffs will have to point to specific actions taken or omitted by the DEQ. If plaintiffs ultimately prevail and the court grants the relief sought by plaintiffs—1) a declaration that the DEQ has failed to properly implement and enforce mandated requirements of the implementation plan and has violated the implementation plan and the Clean Air Act; and 2) preliminary or permanent injunctive relief ordering the DEQ to enforce mandated requirements of the implementation plan—the DEQ may have to revoke or amend certain permits or exemptions that it has previously granted. However, the court will not direct the DEQ to revoke specific permits or attempt to tell the DEQ how to amend those permits to comply with federal law. Thus, the request of the DEQ that certain claims of the plaintiffs be deemed moot because some of the permits cited as examples in plaintiffs' complaint have been amended is denied.

### CONCLUSION

1) The motion of the DEQ to dismiss the complaint of plaintiffs (# 13) is denied.

2) The motion of the DEQ for partial summary judgment (# 37) is denied.

3) The motions of Freightliner Corporation, Precision Castparts Corporation and Tektronix, Inc. (# 15); Simpson Timber Co. (# 20); and Gunderson, Inc. (# 28–1) to intervene are denied.

4) The motions of Freightliner Corporation, Precision Castparts Corporation and Tektronix, Inc. (# 18); Simpson Timber Co. (# 23); and Gunderson, Inc. (# 28–2) to dismiss are deemed moot.