**COMMUNITIES FOR A BETTER ENVIRONMENT, Plaintiff,**

v.

**CENCO REFINING COMPANY, et al., Defendants.**

**No. CV 00–5665 AHM(AIJx).**

United States District Court, C.D. California.

June 22, 2001.

David A. Rosen, Gideon Kracov, Rose, Klein & Marias, Los Angeles, CA, Richard T. Drury, Anne E. Simon, William B. Rostov, Communities For A Better Environ-

ment, Oakland, CA, Everett L. DeLano, III, Everett L. DeLano III Law Offices, Escondido, CA, J. Scott Kuhn, Communities For A Better Environment, Huntington Park, CA, for Plaintiff.

Kurt Weissmuller, Deanne L. Miller, Jocelyn D. N. Thompson, Weston, Benshoof, Rochefort, Rubalcava & MacCuish, Los Angeles, CA, Evelyn F. Heidelberg, Robert H. Conrrad, Jr., Latham & Watkins, Los Angeles, CA, Dean G. Dunlavey, Michael James Carroll, Latham & Watkins, Costa Mesa, CA, James E. Curry, George Gallegos, White, O'Connor, Curry, Gatti & Avanzado, Los Angeles, CA, for Cenco Refining Company and Robertson Charitable Remainder Unitrust.

Piero C. Dallarda, Jennifer T. Buckman, Best, Best & Krieger, Riverside, CA, Barbara B. Baird, Gloria L. White–Brown, Kurt R. Wiese, South Coast Air Quality Management District, Diamond Bar, CA, Gene Tanaka, Best, Best & Krieger, Sacramento, CA, for Barry R. Wallerstein, William A. Burke, Norma J. Glover, Michael D. Antonovich, Hal Bernson, Cynthia P. Coad, Beatrice J.S. Lapisto–Kirtley, Ronald O. Loveridge, Jon D. Mikels, Leonard Paulitz, and S. Roy Wilson,

Colin Lennard, Patricia Jean Chen, Fulbright & Jaworski, Los Angeles, CA, Steven Neil Skolnik, Steven Neil Skolnik Law Offices, Santa Monica, CA, for City of Santa Fe Springs.

James E. Curry, George Gallegos, White, O'Connor, Curry, Gatti & Avanzado, Los Angeles, CA, for MGMG "Pat" Robertson.

## ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS

MATZ, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................. 1067

II. FACTS ......................................................... 1068
 A. The Parties ............................................. 1068
 B. Legal Background ....................................... 1068
 C. CBE's Allegations of Fact .............................. 1069
 D. CBE's Causes of Action ................................ 1072

III. ANALYSIS ..................................................... 1073
 A. Rule 12(b)(6) Standards ................................ 1073
 B. Standing ............................................... 1074
 C. Subject Matter Jurisdiction ............................ 1076
 a. CBE Alleges Violations of Specific, Concrete State Implementation Plan Provisions ..................................... 1077
 b. An Alleged Violation of SIP Provisions Requiring the Application of Best Available Control Technology and New Source Review to New Facility Permit Applications Constitutes Violation of "Any Other Standard, Limitation or Schedule Established under Any Applicable State Implementation Plan" and "Any Requirement to Obtain a Permit" Under Section 7604 ................................. 1080
 D. Claims Under SIP Rules 209 and 806 ................... 1084
 a. Rule 209 ............................................ 1084
 b. Rule 806 ............................................ 1085
 E. Exhaustion of Administrative Remedies ................. 1086
 F. Abstention ............................................. 1087
 G. Supplemental State Law Claims ......................... 1087
 a. Common Nucleus of Operative Facts ................. 1088
 b. Failure to Join a Party Under Rule 19 .............. 1089

IV. CONCLUSION ................................................1089

## I. INTRODUCTION

This lawsuit stems from the reactivation and proposed modification of a petroleum refinery located in the City of Santa Fe Springs, California. In August 1998, Defendant Cenco Refining Company ("Cenco") purchased the 65–year old refinery from a previous owner who had not operated the facility for several years. Cenco applied for and the South Coast Air Quality Management District ("SCAQMD") granted the reactivation and transfer of the previous owner's operator's permit to Cenco. Cenco then proposed a Refinery Expansion Project ("Refinery Project" or "Refinery Upgrade Project") to the City of Santa Fe Springs, which the City certified in July 2000. Within 30 days of the City's certification, Plaintiff Communities for a Better Environment ("CBE") filed suit against Cenco, SCAQMD and the City, alleging violations of the federal Clean Air Act ("CAA") and the California Environmental Quality Act ("CEQA").

CBE's First Amended Complaint is a 62 page document with 25 pages of exhibits. It asserts thirteen total causes of action: eight under the CAA against Cenco and SCAQMD for failure to comply with federal and state permitting rules requiring that the reactivated facility undergo "New Source Review" and submit to stringent environmental controls and cost-benefit analyses; and five supplemental claims under state law against the City for approving the expansion project without properly considering the violation of the permitting rules and the necessity of New Source Review as required by CEQA.

Before the Court are four separate motions to dismiss brought by the defendants: Cenco and SCAQMD filed separate motions to dismiss CBE's CAA claims and the City filed two separate motions to dismiss CBE's CEQA claims.

Defendants assert the following grounds for dismissal: CBE has no standing because although CBE members have apprehended foul odors from current facility operations, the facility is not yet refining petroleum again; CBE fails to state claims under the CAA because violations of permitting requirements do not constitute violations of "emission standards or limitations" under the CAA Citizen Suit Provision; CBE has not exhausted its administrative remedies because, although it complied with all procedural requirements of the CAA, it did not pursue administrative appeal of SCAQMD's transfer of the operator's permit; properly interpreted, applicable permitting rules do not preclude the reactivation and transfer of expired permits under the circumstances here; this Court should not hear this case until the D.C. Circuit Court of Appeals decides Cenco's challenge, filed after this suit, to EPA's "reactivation policy" regarding "shutdown" facilities; this Court has no supplemental jurisdiction over CBE's state law claims because they address permits and agencies different than the CAA claims; and CBE's state law claims fail because although Cenco, a necessary party, is a named party to this suit, its name does not appear in the headings of the state law claims.

As the Court construes it, the key issue in these motions is whether a citizen suit under the Clean Air Act may be premised on allegations that a refinery should have been but was not subjected to the CAA's stringent New Source Review standards during the federally mandated permitting process.

For the reasons set forth below, the Court DENIES defendants' motions to dismiss.

## II. FACTS

### A. The Parties

Plaintiff CBE is a California non-profit environmental health and justice organization with approximately 20,000 members in California. First Amended Complaint ("FAC"), ¶ 19. CBE's organizational goals include protecting and enhancing the environment and public health by reducing air pollution in California's urban areas. *Id.*

Defendant Cenco Refining Co. was established in March 1998 with the purpose of acquiring the refinery. *Id.* at ¶ 27. Cenco, Inc. is a corporation that owns and controls Cenco Refining Co. *Id.* at ¶ 28.

Defendant SCAQMD is the California state agency responsible for the adoption and enforcement of certain rules to attain and maintain the air quality standards set under the CAA in the South Coast Air Basin. *Id.* at ¶ 42.

Defendant City is a municipality or a general law city in the County of Los Angeles. *Id.* at ¶ 45. The City is the lead agency responsible under CEQA for evaluating the environmental impact of the Refinery Project. *Id.*

### B. Legal Background

Congress passed the CAA to prevent pollution and protect and enhance the quality of national air resources. 42 U.S.C. § 7401. The CAA sets out a regulatory scheme designed to prevent and control air pollution. It directs the Environmental Protection Agency ("EPA") to prescribe national ambient air quality standards ("NAAQS") at a level sufficient to protect the public health and welfare. 42 U.S.C. § 7409(a)-(b).

Each state is required to develop a state implementation plan ("SIP") to achieve the NAAQS established by the EPA. 42 U.S.C. § 7410(a). The EPA may approve an implementation plan submitted by a state only if the plan meets all of the requirements of the CAA. 42 U.S.C. § 7410(a)(3)(A), 7502(b). Once approved by the EPA, the requirements and commitments of a SIP become binding as a matter of federal law upon the state. 42 U.S.C. § 7413(a)(2).

In 1977, Congress amended the Clean Air Act to provide more stringent requirements for those geographical areas ("nonattainment areas") that had failed to meet federal standards for pollution control. 42 U.S.C. § § 7501–08. In the 1977 amendments, Congress required those states that had failed to meet federal standards for pollution control to submit revised SIPs to the EPA. 42 U.S.C. § 7502. Under the system for the review of a new or modified source of air pollutant emissions ("new source review"), a state may issue a permit for the construction of a proposed major, new or modified source of air pollutant emissions only if the state requires the source of these air pollutant emissions to comply with the lowest achievable emission rate. 42 U.S.C. § 7503(a)(2). Prior to issuing a permit to a new source of air pollutant emissions, the state must require an analysis of alternative sites, sizes, production processes and environmental control techniques for the proposed source that demonstrates that the benefits of the proposed source significantly outweigh the environmental and social costs to be attributed to the proposed source. 42 U.S.C. § 7502(b)(11)(A), now codified at 42 U.S.C. § 7503(a)(5). If the Administrator of the EPA determines that a state is not properly implementing the provisions of its SIP in issuing a permit to a new source of air pollutant emissions, that state cannot issue the permit. 42 U.S.C. § 7503(a)(4).

The CAA includes a citizen suit provision. 42 U.S.C. § 7604. Under it, "any person may commence a civil action on his own behalf":

(1) against any person (including ... any other governmental instrumentality or agency...) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter [or]

(3) ... against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment)...

The California Environmental Quality Act ("CEQA"), California Public Resources Code § 21000 et seq., is California's version of the National Environmental Policy Act. Like NEPA, CEQA is a means of requiring public agencies to document and consider the environmental implications of their actions. CEQA requires state and local public agencies to consider the environmental impacts of their activities and prepare an Environmental Impact Report ("EIR") for any project that may have a significant effect on the environment. Cal. Pub. Rec.Code § § 21100(a), 21151(a). The purpose of an EIR is to inform decision makers and the public of the potential environmental impacts of a project and to identify feasible alternatives to the project and measures to mitigate or avoid the adverse effects. § 21002.1(a). The EIR must identify the significant effects on the environment, state how they can be mitigated or avoided, and identify alternatives to the project, among other requirements. § 21100(b). Before approving the project, the agency must certify that the final EIR was completed in compliance with CEQA and that the agency reviewed and considered the final EIR.

Under CEQA, public agencies have certain duties and obligations, the extent of which are dictated by the role that the agency occupies in the CEQA process. The lead agency is responsible for carrying out or approving a project as a whole and for preparing the EIR. Cal. Pub. Rec.Code § 21002.1(d). A responsible agency typically has permitting authority or approval power over some discrete aspect of a larger CEQA project. *Id.* During CEQA review, the lead agency consults with responsible agencies as to the proper scope and substance of the EIR. Here, the City of Santa Fe Springs acted as the lead agency, with SCAQMD as the responsible agency. FAC ¶ 63.

## C. CBE's Allegations of Fact

The stationary source at issue in this action is a crude oil refinery located at 12345 Lakeland Road, Santa Fe Springs, California. FAC, ¶ 54. The refinery began operations in approximately 1936 and later was owned by Powerine Oil Company ("Powerine") beginning in the 1950s. *Id.* In June 1995, Powerine informed SCAQMD that it was shutting down the refinery and suspended all refining operations in July 1995. *Id.* at ¶ 55. Following the shutdown, Powerine was sold to a company that publicly stated its intent to dismantle the refinery equipment. *Id.* As late as February 1998, Powerine referred to the refinery as "non-operational." *Id.*

Before the shutdown in 1995, the Powerine refinery was one of the most dangerous refineries in California. *Id.* at ¶ 59. SCAQMD identified the refinery as having the worst record for air quality violations and public complaints of any refinery in the South Coast Air Basin. *Id.* SCAQMD also identified the refinery as the 12th largest source of pollution in the South Coast Air Basin. *Id.* The South Coast Air Basin is widely recognized as having the worst air quality in the United States. *Id.* at ¶ 61. The refinery is located near sev-

eral elementary schools, several child care facilities, a senior citizen residential facility, a state hospital and a drive-in movie theater. *Id.* at ¶ 58.

Cenco was formed in March 1998 with the intent of purchasing, rebuilding and operating the Powerine oil refinery. *Id.* at ¶ 56. Powerine and Cenco are separately functioning corporations. *Id.* at ¶ 130. In August 1998, Cenco formally purchased the oil refinery from Powerine. *Id.* The refinery had gone through a three-year period of disuse. *Id.* at ¶ 140. SCAQMD inspections indicated a state of disrepair and found that pieces of refinery equipment were altered, dismantled, deteriorated or removed. *Id.* at ¶¶ 140, 142. On or about October 23, 1998, Cenco applied to SCAQMD to transfer Powerine's permit to Cenco. *Id.* at ¶ 131. On December 29, 1998, SCAQMD reactivated Powerine's expired permit to operate. Prior to reactivating this permit, SCAQMD knew that Powerine would not be operating the refinery. *Id.* at ¶ 134. On January 15, 1999, SCAQMD transferred Powerine's facility permit to Cenco. *Id.* at ¶ 136.

On April 20, 1999, Cenco submitted to SCAQMD its first 35 applications for construction permits at the refinery. *Id.* at ¶ 63. Cenco informed SCAQMD that these permits would be studied under CEQA, with the City as the lead agency. *Id.*

On April, 21, 1999, the City publicly released a Notice of Preparation of a Draft Environmental Impact Report ("EIR") for the Cenco Refining Company 1999 Refinery Upgrade Project ("Refinery Project"). *Id.* at ¶ 64. The Refinery Project included construction and modifications to the Refinery to (1) comply with state reformulated fuels requirements; (2) replace support facilities that were removed from the refinery; (3) to modify refinery units; and (4) to add new facilities at the refinery. Included as part of the Refinery Project are

all the applications for permits to construct submitted by Cenco to SCAQMD. *Id.*

In October 1999, November 1999, May 2000 and July 2000, SCAQMD gave public notice, pursuant to SCAQMD Rule 212, of Cenco's different permits to construct. *Id.* at ¶¶ 66, 69, 70. In each notice, SCAQMD indicated that it would approve the permits to construct, provided that the City certified the CEQA document it had prepared and that Cenco purchased and surrendered to SCAQMD certain required emissions offsets. *Id.*

CBE responded to each notice, submitting written comments to SCAQMD pointing out legal inadequacies in the permitting. *Id.* at ¶¶ 67, 69. CBE commented that the permitting failed to comply with the CAA and that SCAQMD could not substitute the City's CEQA review process for the environmental review required by the CAA. *Id.* at ¶ 67. CBE also commented that the permitting failed to comply with the CAA and its New Source Review ("NSR") requirements. *Id.* at ¶ 69.

In July 1999, the City released a draft EIR on the Refinery Project. *Id.* at ¶ 72. CBE submitted several comment letters to the City alleging that the Draft EIR violated CEQA and failed to comply with the CAA's NSR requirements. In February 2000, the City released the Final EIR on the Refinery Project. *Id.* at ¶ 75. Again, CBE submitted comment letters objecting to the EIR. *Id.*

On April 24, 2000, the City Planning Commission held a public hearing on the Refinery Project. *Id.* At the hearing, the City acknowledged that it had received a comment letter from CBE. *Id.* At the close of the hearing, the Planning Commission voted to certify the EIR. *Id.* The Planning Commission also voted to approve two conditional use permits. *Id.* On May 10, 2000, CBE filed a timely appeal of the Planning Commission's actions to the City Council.

*Id.* at ¶ 79. The City Council set a public hearing of CBE's appeal for May 25, 2000, which was later postponed to July 27, 2000. *Id.* at ¶¶ 81, 89.

On May 11, 2000, CBE submitted a comment letter to the City that included a number of documents that CBE had received from EPA. *Id.* at ¶ 82. The documents provided information about the contamination at the refinery and the potential for digging, construction and earth moving required by the Refinery Project to disrupt that contamination. *Id.* at ¶ 83. The letter stated that CBE was submitting the documents into the administrative record and requested that the City Council consider them before making a final decision on the project. *Id.* at ¶ 82. The City refused to make CBE's May 11, 2000 comment letter or any of the attached documents part of the administrative record for the public hearing. *Id.* at ¶ 84.

On May 17, 2000, EPA issued a Notice of Violation ("NOV") against Cenco. *Id.* at ¶ 85. The NOV stated that pursuant to SCAQMD

> Rules 201 and 1303, implementing Sections 171(a) and 173 of the [Clean Air] Act, Cenco is prohibited from commencing construction or operation of any piece of equipment at the Facility without installing and operating BACT (equivalent of LAER) for each piece of equipment at the Facility that emits any air contaminant, including VOC and Nox. Cenco is also prohibited from commencing construction or operation of any piece of equipment at the Facility without conducting an analysis of the alternative sites, sizes and production processes demonstrating that the benefits of the Facility as operated outweigh the social and environmental costs and purchasing offsets.

*Id.* On June 9, 2000, EPA wrote SCAQMD about Cenco's applications for permits to construct and stated that:

> with respect to the proposed permits for the hydrogen fluoride alkylation system [Cenco] should provide a thorough alternatives analysis that details alternative locations for the equipment and alternate processes that might have less severe impacts on environmental and public health and safety. This analysis will be required by both the Clean Air Act and Regulation XIII of the South Coast SIP based on a finding that the facility as a whole is subject to New Source Review permitting.

*Id.* at ¶ 88.

On July 27, 2000, the City Council conducted a public hearing on CBE's appeal. *Id.* at ¶ 92. CBE's counsel attended the hearing and several CBE staff and members testified before the City Council. *Id.*

The City Council would not allow any materials into the administrative record that were not in the administrative record before the City Planning Commission. *Id.* at ¶ 93. This decision excluded most of the information concerning Cenco's violation of the Clean Air Act. *Id.* The City Council members did not read the May 11, 2000 comment letter submitted by CBE and did not read the EPA NOV or the June 9, 2000 EPA letter to SCAQMD. *Id.* at ¶ 95. The City Council did add a new condition to the proposed conditional use permits, as follows: "Cenco shall obtain all necessary air permits required for the operation of the refinery in compliance with all applicable statutes, regulations and orders from the Federal Environmental Protection Agency, California Air Resources Board, and the South Coast Air Quality Management District." *Id.* at ¶ 96. At the close of the public hearing, the City Council voted four to one to certify the EIR and approve the two conditional use permits for Cenco. *Id.* at ¶ 97. The city issued a notice of Determination of its Certification of the EIR for the Refinery Project on

July 28, 2000. *Id.* at ¶ 101. CBE filed this action within thirty days of the issuance of the City's Notice of Determination. *Id.*

### D. CBE's Causes of Action

CBE alleges eight causes of action against SCAQMD and Cenco under the Clean Air Act's Citizen Suit Provision, 42 U.S.C. § 7604. All of CBE's claims allege violations of particular provisions of the California SIP. CBE alleges that all eight claims assert violations of an "emission standard or limitation" under § 7604(a)(1).

*CBE's first claim*, against SCAQMD, asserts that the District violated SQAQMD Rule 209 by reactivating Powerine's permit to operate the facility for Cenco. Rule 209 states that:

A permit shall not be transferable, whether by operation of law or otherwise, from one location to another, from one piece of equipment to another, or from one person to another. When equipment which has been granted a permit is altered, changes location, or no longer will be operated by the permittee, the permit shall become void.

*CBE's Second Cause of Action* asserts that SCAQMD violated SCAQMD Rule 212 (Standards for Approving Permits and Issuing Public Notice) by providing for only a 20–day period for public comment on the activation of the permit to operate for Cenco, rather than 30 day period required by the Rule.

*The third claim* asserts that in violation of Rule 806, which provides the requirements for the issuance of an order of abatement, the SCAQMD improperly issued a stipulated order for abatement to Cenco on December 16, 1998; that at the time all permits still belonged to Powerine; and that Cenco was not found to be in violation of any rule or law at the time. For these reasons, CBE alleges, SCAQMD could not lawfully issue any stipulated order of abatement against Cenco. *Id.* at ¶ 162.

*The Fourth Cause of Action* against both Cenco and SCAQMD asserts that the issuance of the Powerine permit to Cenco violates SCAQMD's Rule 1303 because issuance of a permit for a new or modified source requires (1) the installation of Best Available Control Technology ("BACT") at all emissions sources if the facility results in increased emissions of any air pollutant and (2) that the applicant "conduct an analysis of alternative sites, sizes, production processes, and environmental control techniques for such proposed sources and demonstrate that the benefits of the proposed project outweigh the environmental and social costs associated with the project." *Id.* at ¶ 171. CBE alleges that "the refinery is a new source because the Powerine permit to operate was rendered void pursuant to SCAQMD Rule 209." Complaint, ¶ 172. CBE also alleges that Cenco has violated Rule 1303 by commencing activities constituting construction and has conducted limited operations of some equipment at the facility without: (1) having applied for or obtained new source review permits to construct; (2) employing BACT; (3) conducting an analysis of alternative sites, sizes production processes and environmental control techniques analysis, or (4) obtaining emissions offsets for every piece of equipment capable of emitting VOCs. *Id.* at ¶¶ 179–184.

*CBE's Fifth Cause of Action*, against both SCAQMD and Cenco, asserts that the issuance of the operator permit to Cenco violated Rule 2005 and the Clean Air Act New Source Requirements (42 U.S.C. § 7503) for failure to apply BACT and NSR.

*The Sixth Cause of Action* against Cenco asserts that Cenco has constructed, modified and/or operated a Title V facility, as defined by 42 U.S.C. § 7661a(a), with-

out a Title V Permit as required by SCAQMD Rules 3002 and 3003.

CBE's *seventh claim* against Cenco for violation of Rules 201, 209 and 210 asserts that Cenco 1) failed to provide required information (regarding analysis of alternative sites, installation of BACT, etc.) in its application to transfer and reactivate Powerine's permit; 2) and failed to apply for and acquire a new, valid facility permit to operate the facility.

*The Eighth Cause of Action* against SCAQMD and Cenco for violation of SCAQMD Regulation XVII and Rule 1703 asserts that SCAQMD issued permits to Cenco that do not comply with the requirements to use BACT; to demonstrate that the permitted source will not violate maximum allowable increase over baseline concentrations; and to conduct an analysis of the impairment to visibility, soil and vegetation that would occur as a result of the new source.

CBE also alleges five state law causes of action, under CEQA, against the City of Santa Fe Springs.

CBE's *Ninth Cause of Action* asserts that the City violated CEQA by failing to consult with the EPA during the EIR process and by failing "to consider the effects of the permitting process that the U.S. EPA has indicated the refinery will have to go through under the CAA and NSR contained in the California SIP." Complaint, ¶¶ 246–47. *The Tenth Cause of action* asserts that the City violated CEQA by failing to consider and include in the administrative record documents submitted during the EIR process, including the EPA NOV to Cenco. *The Eleventh Claim* states that the City violated CEQA by failing to impose feasible mitigation measures to reduce significant effects of the Upgrade Project. *Claim Twelve* asserts that the City failed to provide notice of public hearings and environmental documents on its web page. *CBE's Thirteenth*

and final cause of action asserts that the City violated CEQA by approving conditional use permits inconsistent with the California SIP (based on the EPA's NOV) and the City's general plan.

## III. ANALYSIS

### A. Rule 12(b)(6) Standards

On a motion to dismiss pursuant to F.R.Civ.P. 12(b)(6) for failure to state a claim, the allegations of the complaint must be accepted as true and are to be construed in the light most favorable to the nonmoving party. *Wyler Summit Partnership v. Turner Broadcasting System, Inc.,* 135 F.3d 658, 661 (9th Cir.1998). "[A] complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* Where a motion to dismiss is granted, a district court should provide leave to amend unless it is clear that the complaint could not be saved by any amendment. *Chang v. Chen,* 80 F.3d 1293, 1296 (9th Cir.1996).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.... However, material which is properly submitted as part of the complaint may be considered" on a motion to dismiss. *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1990) (citations omitted). Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgment. *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994) (*citing Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 n. 3 (1st Cir.1991)).

## B. Standing

Standing is a threshold matter of jurisdiction. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 93–94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). To proceed with its lawsuit, CBE must satisfy the "irreducible Article III Constitutional minimum" standing requirements. *Lujan v. Defenders of the Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). An association has standing to bring a suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires participation of the individual members. *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

The critical element in this case is the first: CBE must demonstrate that individual members would otherwise have standing to sue in their own right. Individuals have standing if: (1) they have suffered an "injury-in-fact"; (2) the injury is "fairly traceable" to the challenged conduct of the defendant; and (3) the injury will likely be redressed through the relief sought in the complaint. *Lujan*, 504 U.S. at 560–561, 112 S.Ct. 2130.

The burden of establishing each of these elements rests on the party seeking to invoke the court's jurisdiction. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Org. of Women v. Scheidler*, 510 U.S. 249, 256, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994).

The injury-in-fact element of standing requires a plaintiff to allege an injury that is (a) concrete and particular, as opposed to an undifferentiated interest in what the plaintiff believes to be proper application of the law, and (b) actual and imminent, not conjectural or hypothetical. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

CBE alleges three bases for injury-in-fact: (1) injury to its members from the present operations of the Cenco refinery; (2) injury to its members from anticipated operations of the Cenco refinery; and (3) injury to its members from being denied their right to participate in the public NSR process.

CBE alleges first that "[w]hile not as extensive as the emissions that will occur if and when the refinery operates at full capacity, the emissions associated with the current operations at the refinery are already adversely affecting CBE's members." Opposition, p. 17. In its complaint, CBE alleges that "[t]he health, economic, informational, scientific, organizational and conservational interests of CBE and its members have been, and continue to be, adversely affected by Defendants' violations of the Clean Air Act." FAC, ¶ 20. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. On defendants' motions to dismiss, these allegations of injuries already sustained are sufficient to withstand dismissal.

For the guidance of the parties, the Court notes that even if the motions to dismiss were converted to motions for summary judgment, plaintiffs' standing showing would still likely be sufficient. CBE refers to declarations of several of its

members, which it submitted in opposition to the motions. According to Gilbert Aguirre, a CBE member and resident of Santa Fe Springs, "[d]uring the week of August 21, 2000, I passed the Cenco refinery in the middle of the afternoon with my wife. As we passed by ... I smelled a very distinctive chemical odor. The odor went away after I drove farther away from the refinery. I recall smelling a similar odor on at least two other occasions in the last three months." Declaration of Gilbert Aguirre, ¶ 11. Another CBE member, Denise Ng, complains of having smelled an odor that seemed to be a chemical mixture as she traveled past the refinery. Declaration of Denise Ng, ¶ 8. This occurred in May 2000 and in response, Ng wrote to SCAQMD to inform them of the odor. *Id.* CBE also points to the declaration of member Douglas Klausman, who lives a few blocks from the refinery. Declaration of Douglas Klausman, ¶ 1. Klausman states that he has "seen smoke and smelled fumes from the refinery at [his] house." *Id.* at ¶ 4. Although it is not clear from Klausman's statement when he apprehended the smoke and fumes, CBE cites his statement in support of its assertion that current refinery operations are adversely affecting CBE members. Opposition, p. 17.

Although those CBE members' complaints about odors from the Cenco refinery are far from grave, the impact on them does appear to be concrete and actual, as opposed to speculative. CBE's member declarants have more than an abstract concern about clean air or an undifferentiated interest in a particular application of the law. They live and work in the immediate vicinity of the Cenco refinery and they allege that they have already been affected by the refinery's operations. *Friends of the Earth v. Laidlaw,* 528 U.S. 167, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000) (FOE member alleged injury-in-fact because "he lived a half-mile from Laidlaw's facility; ... he occasionally drove over the North Tyger River, and ... it looked and smelled polluted"); *Ecological Rights Foundation v. Pacific Lumber Co.,* 230 F.3d 1141, 1149 (9th Cir.2000) ("[d]aily geographical proximity ... may make actual past recreational use less important in substantiating an injury in fact because a person who lives quite nearby is likely to notice and care about the physical beauty of an area he passes often"); *Friends of the Earth v. Consolidated Rail Corp.,* 768 F.2d 57, 61 (2d.Cir.1985) (affiant who passed the Hudson River regularly and found its pollution "offensive to his aesthetic values" stated injury in fact).

■ As long as injuries are concrete and actual, the range of cognizable injuries is broad and inclusive. Even harm to purely aesthetic or recreational interests is sufficient injury to confer standing. *Laidlaw,* 120 S.Ct. at 704 (finding standing when members of environmental group decreased recreational uses of river they suspected was being polluted); *Ecological Rights Foundation,* 230 F.3d 1141, 1144 (9th Cir.2000) (finding standing for citizens whose enjoyment of waterways was allegedly "impaired" by suspected pollution); *Consolidated Rail Corp.,* 768 F.2d at 61. Here the harm is not merely to aesthetic or recreational interests; breathing even slightly polluted air entails a health risk. As CBE states, "CBE's members live, work, recreate and engage in other activities in the vicinity of the refinery. Most importantly, *they breathe the air,* including the air polluted as a direct result of the defendants' failures to comply with the law." Opposition, p. 16.

Although Cenco disputes CBE's other grounds for injury-in-fact, Cenco says nothing about the declarations of those CBE members who have already experienced the byproduct of the refinery's operations.

## C. Subject Matter Jurisdiction

 Cenco and SCAQMD allege that the Clean Air Act's citizen suit provision, 42 U.S.C. § 7604, does not encompass CBE's action. The citizen suit provision provides that "any person may commence a civil action on his own behalf":

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter [or]

(3) against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under Part C of this subchapter . . . or Part D of subchapter I of this chapter (relating to nonattainment) . . .

42 U.S.C. § 7604(a)(1)-(3). CBE contends, and Cenco and SCAQMD dispute, that CBE's suit challenges an alleged violation of an emission standard or limitation.

 The citizen suit provision provides a multi-part definition of "emission standards or limitations" as follows:

For purposes of this section, the term "emission standard or limitation under this chapter" means—(1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard, (2) a control or prohibition respecting a motor vehicle fuel or fuel additive (3) any condition or requirement of a permit under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment), section 7419 of this title (relating to primary nonferrous smelter orders), any condition or requirement under an applicable imple-

mentation plan relating to transportation control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery requirements, section 7545(e) and (f) of this title (relating to fuels and fuel additives), section 7491 of this title (relating to visibility protection), any condition or requirement under subchapter VI of this chapter (relating to ozone protection), or any requirement under section 7411 or 7412 of this title (without regard to whether such requirement is expressed as an emission standard or otherwise); or (4) any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V of this chapter or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations . . . which is in effect under this chapter . . . or under an applicable implementation plan.

42 U.S.C. § 7604(f) (emphasis added). "Put more simply, an emission standard or limitation is broadly construed as any type of control to reduce the amount of emissions into the air." Citizens for a Better Environment v. Deukmejian, 731 F.Supp. 1448, 1454 (N.D.Cal.1990). Plaintiffs seeking to bring a citizen suit for violation of an emission standard or limitation contained in a SIP must allege a violation of a specific strategy or commitment in the SIP; suit may not be maintained solely to force regulators to attain the NAAQs or to modify or amend a SIP to conform to a plaintiff's own notion of proper environmental policy. Deukmejian, 731 F.Supp. at 1454.

CBE alleges eight causes of action against Cenco and SCAQMD under the Clean Air Act. All of CBE's claims allege violations of particular provisions of the California SIP. However, defendants argue

that none of these alleged violations of SIP provisions qualifies as a violation of "emission standards or limitations" under 42 U.S.C. § 7604(f) because they allege no more than that SCAQMD decided to issue permits, which CBE happens to disapprove. They assert generally that the CAA Citizen Suit provision does not recognize suits based on such administrative determinations but instead supports suits against polluters only for violations of objective numerical standards. Cenco Motion, p. 12–13.

### a. CBE Alleges Violations of Specific, Concrete State Implementation Plan Provisions

 "Citizen suits ... are authorized to enforce SIP provisions." *Coalition for Clean Air v. South Coast Air Quality Management District*, 1999 U.S. Dist. LEXIS 16106, *6 (C.D.Cal.) (Hupp, J.). Plaintiffs seeking to bring a citizen suit for violation of an emission standard or limitation contained in a SIP must allege a violation of a specific strategy or commitment in the SIP; suit may not be maintained solely to force regulators to attain the NAAQs or to modify or amend a SIP to conform to a plaintiff's own notion of proper environmental policy. *Deukmejian*, 731 F.Supp. at 1454.

Each one of CBE's eight CAA claims clearly asserts the violation of a specific SIP provision. *See supra* p. 1072–73. However, defendants assert that the SIP provisions at issue here are in fact unenforceable by citizen suit. They rely on *Wilder v. Thomas*, 854 F.2d 605, 613–616 (2d Cir.1988), in which the Second Circuit emphasized that a person may not sue to simply attain NAAQs (a SIP's overall objectives) or to modify or amend a SIP to conform to a plaintiff's own notion of proper environmental policy; instead, "a citizen suit must allege a violation of a specific strategy or commitment in the SIP." Defendants also proffer numerous cases

purporting to require that citizen suits allege violations of "specific quantifiable standards and limitations" or "particular numeric emission limitation[s]." Cenco Motion, p. 14. As defendants point out, several district court cases have rejected jurisdiction over citizen suits based on permit provisions that merely restate the common law of nuisance; the courts found the common law rule "non-objective" and thus unenforceable under section 7604. *Helter v. AK Steel Corp.*, 1997 U.S. Dist. Lexis 9852, *50 (S.D.Ohio); *Satterfield v. J.M. Huber Corp.*, 888 F.Supp. 1561, 1566 (N.D.Ga.1994). These cases do require citizen suits to be based on alleged violations of specific and objective provisions of SIPs, rather than general air quality goals or subjective tests.

However, the SIP rules plaintiff sues on represent specific measures designed to achieve the NAAQs, not the NAAQs themselves. Defendants do not assert that the SIP rules at issue involve purely subjective standards; clearly they announce concrete, objective permitting requirements. Defendants' argument that these SIP Rules are unenforceable through a Citizen Suit merely because they do not contain *numerical* standards or limitations is unpersuasive. *Wilder*, 854 F.2d at 615–16 (suit to redress violations of non-numerical SIP requirements, such as failure "to obtain the list of candidate hot spots from local transportation planning agencies as required by 1984 SIP 3.2," would be permissible because SIP Rules stated a specific commitment); *Oregon Environmental Council*, 775 F.Supp. at 360–62 (permitting suit challenging regulatory authority "granting permit applicants the right to operate major new or modified sources of volatile organic compounds without requiring compliance with the new source review requirements mandated by the implementation plan"); *Deukmejian*, 731 F.Supp. at 1457 (suit against Metropolitan Transpor-

tation Commission permissible based on MTC's alleged failure to follow the process for discretionary delay of certain transportation projects; "And while MTC only committed to a 'process' and not a specific result, there is no reason why a process, plainly spelled out, cannot constitute a valid, identifiable strategy for achieving plan objectives.").

Nevertheless, defendants further assert that certain kinds of SIP provisions, namely permitting standards, are unenforceable by Citizen Suit. For this proposition, they rely on *League to Save Lake Tahoe v. Trounday*, 598 F.2d 1164 (9th Cir.1979). In *Trounday*, plaintiffs brought a citizen suit under section 7604 against the Nevada Department of Human Resources (the state air pollution agency under the Act) and hotel-casino owners to enjoin the construction of two hotel-casinos in Lake Tahoe. Pursuant to the Nevada SIP, the hotel owners applied for and the agency issued registration certificates for the proposed "new complex sources." Plaintiffs demanded that the certificates be withdrawn, asserting that their issuance was an abuse of discretion because the technical analysis upon which the action was taken "did not take into account the situation that would occur under the most adverse meteorological conditions and failed to consider CO levels within the project areas." *Id.* at 1168. When the certificates were not withdrawn, plaintiffs brought suit "because construction of the facilities would cause violations of the ambient air quality standards for CO cited supra, defendants had not complied with § 3.2.2 of the Nevada air quality regulations requiring a valid certificate, and further, that this constituted a violation of an emission standard or limitation within the meaning of § 304 of the Act." *Id.* The district court dismissed the case.

The Ninth Circuit affirmed. It found first that the district court *had* jurisdiction under the then-existing[1] citizen suit provision because the permitting procedure constituted an emission standard or limitation, under subsection 7604(f)(3) describing "any condition or requirement under an applicable implementation plan relating to transportation control measures ..." *Id.* at 1169–73. The Court then analyzed whether plaintiff's claims stated a cause of action upon which relief could be granted, characterizing plaintiff as "arguing that when constructed the two hotel-casinos involved will violate the applicable ambient air quality standards for CO and, therefore, that the registration certificates issued are invalid." The Court found that:

> The effect of appellants' position is to blur the established distinction between an "emission standard or limitation" and the ambient air quality standards. To adopt their view would not only contravene the principle that such air quality standards are not emission limitations, but would also sanction federal jurisdiction based solely upon allegations of a prospective violation of the ambient air quality standards. Section 304(a) of the Act provides no basis for such a suit. Nor could such an interpretation be reconciled with the accepted definition of "emission standard or limitation," the purpose of which is to insure achievement and maintenance of the ambient air quality standards.

*Id.* at 1173. The Court then quoted *Citizens Association of Georgetown v. Walter E. Washington*, 535 F.2d 1318 (D.C.Cir. 1976) as follows:

> The enumerated items (i.e. emission standards or limitations) were intended as "objective evidentiary standard(s) (which) would have to be met by the citizen who brings an action under the

---

1. The citizen suit provision had not yet been amended to include subsection 7604(f)(4).

(citizen suit provision)." S.Rep. No. 91–1196, 91st Cong., 2d Sess. 36 (1970), Reprinted in Legislative History, Supra, at 436. The determination of whether a government instrumentality or other "person" is a polluter for purposes of section 304 was to be made against these objective standards, which were to be "settled in the administrative procedure leading to an implementation plan or emission control provision." Id., reprinted in Legislative History, Supra, at 436. Congress expressly intended that an alleged violation not involve "reanalysis of technological or other considerations at the enforcement stage." Id., reprinted in Legislative History, Supra, at 436.[2]

The *Trounday* Court stated that objective standards properly subject to citizen suit would include "the procedural provisions of the Nevada implementation plan requiring application for a certificate for any proposed new complex source, review of that application by designated state officials, and issuance of the certificate 'unless the environmental evaluation submitted by the applicant shows, or the director determines, that the source will prevent attainment and maintenance' of the ambient air quality standards." Id. at 1174.

The Court found, however, that "there has been complete compliance with all these requirements." Id. at 1174. Regarding plaintiffs' allegation that defendants failed to factor in the "most adverse meteorological conditions," the Court stated that plaintiffs "have cited no federal or state statutes or regulations, however, mandating consideration of such a factor

---

**2.** Defendants rely specifically on *Georgetown* for its holding that only polluters and not regulators, such as SCAQMD, may be sued under section 7604. In *Georgetown*, the D.C. Circuit found that it had no jurisdiction to adjudicate plaintiff's demand that the District of Columbia revoke construction permits for certain projects. The Court stated that:

> After reviewing the legislative history of the citizen suit provision, it is our conclusion that an allegation that a government instrumentality has failed to enforce the Clean Air Act does not satisfy the statutory requirement that the government instrumentality be alleged to be in violation of "an emission standard or limitation." ... [T]he enacted version limited federal jurisdiction over suits against a governmental instrumentality to those alleging a violation of an emission standard or limitation, or of an order issued by the Administrator of the EPA or by a State with respect to an emission standard or limitation. And the legislative history surrounding the evolution of those limitations quite clearly indicates that section 304(a)(1) confers federal jurisdiction only over suits against polluters, and, under certain conditions, the Administrator of the EPA.

Id. at 1320–21. Defendants fail to point out that section 7604 was substantially amended in 1977 and the explicit language of the Clean Air Act as amended does not exclude suits against regulators to enforce CAA requirements. Since then courts have declined to follow the D.C.Circuit's holding that the citizen suit provision encompasses suits only against polluters. See, e.g., *American Lung Association v. Kean*, 871 F.2d 319, 324–5 (3d Cir.1989) (declining to follow *Georgetown* and finding jurisdiction to entertain citizens' action against the New Jersey Department of Environmental Protection in its regulatory capacity to compel promulgation and implementation of system of ground level ozone emission regulations); *Oregon Environmental Council v. Oregon Department of Environmental Quality*, 775 F.Supp. 353 (D.Or.1991) (permitting citizens suit against Oregon Department of Environmental Quality for issuing permits without requiring New Source Review); *Citizens for a Better Environment v. Deukmejian*, 731 F.Supp. 1448 (N.D.Cal.1990) (finding jurisdiction over suit against, inter alia, the Bay Area Quality Management District for failing to implement contingency measures to reduce emissions). Indeed, the *Trounday* Court itself did not find that suit there was barred against the state agency based on *Georgetown*. The Court finds nothing in the plain language of the present section 7604 to insulate state regulators from suit for violating "emission standards and limitations" under the Act.

as an essential precondition to issuance of a permit." *Id.* at 1174. Plaintiffs were thus seeking impermissible "judicial review of an administrative decision entrusted by Congress to state officials":

> for us to now hold that, after having [fulfilled their obligations under the Nevada plan], they are still subject to a valid claim for violation of an emission limitation based upon those same actions would be an anomalous result which we believe is mandated neither by the Act not by the Nevada plan...

*Id.*

Concluding that plaintiff failed to state a claim under the citizen suit provision, the Court added that plaintiff's challenge to defendants' administrative determinations "should have been pursued through the administrative review procedures set forth as part of the plan." *Id.*

*League to Save Lake Tahoe* does not compel declining jurisdiction here. The holding in that case depended on the Court's finding that plaintiffs were seeking enforcement of the NAAQs, not specific, objective measures in a SIP. The *League to Save Lake Tahoe* court found that procedural permitting requirements *could* form the basis of a citizen suit, but that no cause of action could be stated because defendants had complied with all such requirements (plaintiffs could not establish that defendants were required to consider the factor that they had allegedly not considered).[3] Here, CBE asserts violations of

procedural permitting requirements and points to specific SIP requirements for each violation it alleges—defendants were required to 1) void, not transfer Powerine's permit, and therefore treat Cenco's application as one for a new source permit under Rule 209; 2) give a 30 day public comment period on the reissuance under Rule 212; 3) enter into abatement stipulations only with present violators under Rule 806; 4) apply new source review to the applied-for permit and under Rules 1303 and 2005; 5) install BACT under Rules 1303, 2005 and 1703. Plaintiff clearly is not seeking to force defendants to attain the general goals of the NAAQs or to modify or amend a SIP to reflect its own notion of proper environmental policy.

**b. An Alleged Violation of SIP Provisions Requiring the Application of Best Available Control Technology and New Source Review to New Facility Permit Applications Constitutes Violation of "Any Other Standard, Limitation or Schedule Established under Any Applicable State Implementation Plan" and "Any Requirement to Obtain a Permit" Under Section 7604**

 CBE alleges that defendants' SIP violations constitute redressable violations of "emission standards or limitations," under several different definitions of "emission standards or limitations" in Subsection 7604(f).[4] The Court need not discuss

---

3. Defendants also argue that, as in *League*, permitting suit here would impermissibly "sanction federal jurisdiction based solely upon allegations of a prospective violation..." But the *League* court found simply that plaintiffs's allegation that *"when constructed,"* the hotels at issue would violate the NAAQs impermissibly alleged a prospective violation. Here, plaintiffs do not base their suit on future violation of the NAAQs but on existing violations of specific permitting provisions in the SIP.

4. CBE also argues that suit is appropriate under § 7604(a)(3). It provides for suit " against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under ... part D of subchapter I of this chapter (relating to nonattainment)..." The Court need not address this basis for jurisdiction.

all of the definitions relied on by CBE because the Court finds that defendants' alleged violations of permitting requirements and failure to require BACT and NSR under those requirements violate both "any other standard, limitation or schedule ... under any applicable State Implementation Plan" and "any requirement to obtain a permit" under § 7604(f)(4).

The first clause of subsection (f)(4) defines "emission standard or limitation" as "any other standard, limitation, or schedule established ... under any applicable State implementation plan approved by the Administrator." The introductory words "any other" suggest that this clause, which begins the last subsection of the definition of "emission standards and limitations," is meant to serve a catch-all purpose. The terms "standard" and "limitation," qualified only in that they must be present in approved SIPs, are broad on their face, and ostensibly broad enough to encompass the permitting requirements at issue here. SCAQMD nevertheless asserts, relying on 42 U.S.C. § 7602(k), that "standards" and "limitations" are limited to "requirement[s] established by the State or the Administrator which limit the quantity, rate, or concentration of emissions of air pollutants on a continuous basis." SCAQMD Reply, p. 17. But 42 U.S.C. § 7602(k) defines not "standard" and "limitation," but "*emission* standard" and "*emission* limitation" and is not the provision that defines "emission standard" and "emission limitation" for the purpose of establishing Citizen Suit jurisdiction; section 7604(f) is. *See Conservation Law Foundation v. FHA,* 24 F.3d 1465,

1477 n. 5 (1st Cir.1994) ("Defendants' use of the definition for 'emission standard or limitation' provided in 42 U.S.C. § 7602k (a requirement established by the state administrator) is improper because § 7604(f) defines this term for all of § 7604, trumping the definition in § 7602k"). There appears to be no basis for reading SIP-included "standards" and "limitations" in (f)(4) narrowly as "*emission* standards" and "*emission* limitations"; the Court will not import "emission" into a subsection that does not expressly include it. To do so would ignore the plain language of the statute and make § 7604(f)(4) a completely circular definition of "emission standard or limitation."[5]

The SIP permitting provisions delineate standards governing the issuance of permits and limitations on their issuance, as well as technological control standards that must be applied as a prerequisite to the issuance of permits. According to the definition of "emission standard or limitation" in § (f)(4), therefore, defendants' alleged failure to enforce such SIP permitting requirements violates a standard and/or limitation under the approved California SIP. CBE's allegation that these standards were not followed is sufficient at the pleading stage to state cognizable violations under the Clean Air Act and its citizen suit provision.

CBE asserts that defendants have also violated "any requirement to obtain a permit as a condition of operations." § 7604(f)(4). CBE alleges that Cenco was required to apply for a new permit to operate and that SCAQMD was required to process a new (not previously voided)

---

5. It would also appear to render the subsection (f)(1) definition—"a schedule or timetable of compliance, emission limitation, standard of performance or emission standard"— superfluous. Subsection (f)(4) would be re- dundant if it meant, as defendants propose, 'any *emission* standard or *emission* limitation ... under any applicable SIP,' because such emission standards and limitations are already enumerated in (f)(1).

permit (Rule 209), provide 30 days notice for public comment (Rule 212), and apply BACT and NSR as prerequisites to obtaining the applied-for permits (Rules 1303, 2005, etc.).

SCAQMD asserts that there has been no violation of a requirement to obtain a permit—"even if the District erroneously interpreted its own rules" and failed to adhere to permitting requirements—because Cenco now has an operator's permit. SCAQMD Motion, p. 17; SCAQMD Reply, p. 19–20. Cenco would have the Court deem it to be in compliance even if the permit it acquired was not valid. CBE, in contrast, asks the Court to find that Cenco's failure to obtain a permit as required by applicable SIP provisions violates "any requirement to obtain a permit." The Court declines Cenco's invitation to insulate it from suit based on the issuance of an allegedly invalid permit; CBE has alleged violations of "any requirement to obtain a permit."

At the hearing, defendants for the first time argued that § 7604(f)(4) does nothing more than provide for citizen suit based on violations of the CAA's Subchapter V permit program, and so cannot enable suit based on SIP permitting violations. As defendants rightly point out, subsection (f)(4) of the citizen suit provision does indeed provide for suit based on violations of Title V permits ("any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V"). However, that is clearly only one of the types of violations subsection (f)(4) addresses. The subsection also encompasses "any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V *or under any applicable State implementation plan approved by the Administrator.*" And it concerns "any requirement to obtain a permit as a condition of operations ... which is in effect under this chapter *or under an applicable implementation plan.*" Nothing in subsection (f)(4) limits it to subchapter V permits; rather, it expressly reaches other standards and permit requirements under a SIP.[6]

Defendants point to no support in the cases, legislative history or legal scholarship for their suggested limitation of (f)(4). Instead, the authorities suggest that the subsection is not so limited. *See Save Our Health Organization v. Recomp,* 37 F.3d 1334, 1336 (8th Cir.1994) (Arnold, J.) (Relying on "any other standard, limitation or schedule established ... *under any applicable State implementation plan approved by the Administrator...* " to find that "[t]the emission standard the plaintiffs claimed Recomp violated was the EPA approved Minnesota SIP, which regulated odors," and that "there is jurisdiction because of plaintiffs' nonfrivolous allegation of violations of the EPA-approved

---

**6.** Defendants also assert that because under § 7661d a citizen can petition the Administrator to object to the issuance of a subchapter V permit, it would be error to interpret § 7604(f)(4) to permit suit for the wrongful issuance of other types of permits. But just because a federal administrative remedy is available for objecting to the issuance of a subchapter V permit does not mean that a legal remedy under § 7604 is unavailable for a defendant's failure to comply with SIP permitting requirements. Although Cenco may be required to eventually acquire subchapter V permits, the mere fact that plaintiffs could challenge such permits under § 7661d at that time does not preclude plaintiffs from attacking other permits *now* under the broad language of subsection (f)(4); indeed, the Clean Air Act nowhere states that plaintiffs must wait for the issuance of subchapter V permits before they can sue on existing violations of the SIP. This does not necessarily mean that plaintiffs will have "two bites at the apple," once under § 7604 and again under § 7661d, as defendant's counsel suggested at the hearing. Instead, basic principles of res judicata would likely apply to repeated attacks on permitting.

SIP"); *L.E.A.D. v. Exide Corp.*, 1999 WL 124473, \*23 (E.D.Pa.) (Quoting subsection (f)(4) and stating that "[t]herefore, a State Implementation Plan ("SIP"), for example, may be enforced through the citizen suit provision of the CAA"); Anthony Wynne, *Sierra Club v. Public Service Company of Colorado: Judicial Amendment or Towards Continuous Emission Compliance; Expanding the Scope of Citizen Suits and the 1990 Amendments to the Clean Air Act*, 14 Pace Envt'l L.Rev. 383, 392 (1996) ("The 1990 amendments broaden the scope of CAA citizen enforcement by adding the authority to enforce any of the provisions of the new general permit scheme of Title V, *or any EPA-approved SIP.*") (emphasis added); Roy Belden, *Preparing for the Onslaught of Clean Air Act Citizen Suits: A Review of Strategies and Defenses*, 1 Envt'l Law. 377, 384 (1995) ("Moreover, Congress amended the citizen suit provision, particularly CAA section 304(b), so that the terms 'emission standard or limitation' shall provide citizens with the authority to enforce provisions of the operating permit program *and any EPA-approved SIP.*") (emphasis added); David Buente, *The Clean Air Act Amendments of 1990: Closing the Enforcement Loop*, 21 Envt'l L. 2233, 2237–38 (1991) (same).

At the hearing defendants also asserted that in light of language in 42 U.S.C. § 7413, the CAA's provision for EPA (as opposed to citizen) enforcement, the citizen suit provision cannot encompass violations of SIP permitting requirements. Section 7413 enables the Administrator to remedy violations of "any requirement or prohibition of an applicable implementation plan" and a State's "failure to enforce [a] SIP or permit program." Defendants argue that because § 7604 does not employ this clear and broad language, it should not be construed to enable suit for violations of SIP permitting requirements or failures to enforce the SIP. Although "any other standard, limitation, or schedule established . . . under any applicable State implementation plan" is not identical to "any requirement or prohibition of an applicable implementation plan," this is no reason to confine section 7604 narrowly to Title V permitting. Indeed, sections 7413 and 7604 are in entirely different subchapters of the CAA. There is no indication, express or otherwise, that the former somehow limits the latter, and the Court declines to do so. By the same token, and in light of the differences in the language between section 7604 and 7413, the Court need not and does not find that the provisions have identical scope. What the Court does find, simply, is that it has jurisdiction over a plaintiff's allegation that a defendant violated permitting standards requiring BACT and NSR that are part of an EPA-approved state implementation plan.

A recent district court decision confirms that violations of permitting standards requiring BACT and NSR support claims under the Clean Air Act. In *Oregon Environmental Council v. Oregon Department of Environmental Quality*, 775 F.Supp. 353 (D.Or.1991), private plaintiffs brought suit against the state environmental agency (DEQ) for:

(1) failing to provide for the 'highest and best practicable treatment and control by . . . fail[ing] a) to require compliance with reasonably available control technology emission standards and limitations; b) to enforce new source review rules; c) to define and enforce reasonably available control technology emission standards and limitations for manufacturing processes for which the EPA has not published control technology guidelines; . . .'

(2) failing to enforce mandated, reasonably-available control technology emission standards and limitations set in the implementation plan at major sources of

volatile organic compounds in the Portland nonattainment area ... The DEQ has issued permits to these sources that allow them to exceed emission standards and limitations mandated by the implementation plan and that substitute less stringent limits not authorized by the implementation plan; and

(3) granting permit applicants the right to operate major new or modified sources of volatile organic compounds without requiring compliance with the new source review requirements mandated by the implementation plan.

*Id.* at 360. DEQ sought dismissal based upon the claimed absence of an alleged violation of an "emission standard or limitation" under § 7604. The district court found that plaintiff had established grounds for jurisdiction under the citizen suit provision.

*Oregon Environmental Council* provides general support for suits asserting violations of state law permitting requirements. Indeed, the permitting requirements at issue in *Oregon Environmental Council* are almost identical to some of the permitting requirements here, *e.g.,* those provisions requiring BACT and NSR at the permitting stage. Defendants argue that the Court should not follow *Oregon Environmental Council* because the case purportedly brushes aside Ninth Circuit precedent and has not been cited for its jurisdictional holding. However, the Ninth Circuit case *Oregon Environmental Council* purportedly ignores is *Trounday,* defendants' interpretation of which this Court has already rejected. Properly construed, the two cases are perfectly consistent and do not preclude citizen suits

premised on violations of SIP permitting requirements.[7]

## D. Claims Under SIP Rules 209 and 806

### a. Rule 209

District Rule 209 provides that:

A permit shall not be transferable, whether by operation of law or otherwise, from one location to another, from one piece of equipment to another, or from one person to another. When equipment which has been granted a permit is altered, changes location, or no longer will be operated by the permittee, the permit shall become void.

The SCAQMD defendants assert that Rule 209, properly interpreted, "does not invalidate a permit, and require the operator to start afresh with New Source Review, merely upon an application for a change of owner or operator." SCAQMD Motion, p. 12. SCAQMD relies on § 42301(f) of the California Health and Safety Code and District Rule 301(c)(2), neither of which have been enacted into the SIP, to support its interpretation of Rule 209.

Under Cal. Health and Safety Code § 42301(f), the state permitting system is to:

provide for the reissuance or transfer of a permit to a new owner or operator of an article, machine, equipment or contrivance ... [U]nder no circumstances shall the criteria specify that a change of ownership or operator alone is a basis for requiring more stringent emission controls or operating conditions than

---

7. The Court rejects Cenco's assertion that CBE has not asserted "ongoing" or "repeated" violations. CBE alleges that Cenco is operating equipment at the facility without a valid permit. The Court finds that CBE's allegation of the issuance of and operation under an invalid permit suffices to meet the requirement of section 7604(a)(1) that a violator repeat its violation or "be in violation" of an emission standard or limitation.

would otherwise apply to the article, machine, equipment or contrivance.

Under District Rule 301(c)(2), existing equipment permits may undergo a "change of operator" as long as the initial operator files a change of operator application, the new operator will operate the same equipment at the same location, and the new operator files an application for a Permit to Operate within one year after the last renewal of a valid permit.

SCAQMD contends that to read Rule 209 consistently with these valid and enforceable state provisions it should be read not to bar any and all permit transfers, but to bar only *unauthorized* permit transfers. SCAQMD also states that:

> Over 1400 permits change ownership every year. Although many of these changes come after periods of non-operation, this does not automatically make them subject to new source review. Under plaintiff's interpretation of Rule 209, existing businesses' valid permits would be voided merely because the business was sold. This cumbersome interpretation of the regulation is utterly absurd.

CBE responds with two arguments: (1) CBE's complaint asserts three different violations of Rule 209—by the transfer, by Powerine's indication of its intent not to operate the equipment any longer and by the alteration of facility equipment—only one of which defendants take issue with and; (2) to the extent the plain language of Rule 209 might conflict with state provisions and rules not enacted into the SIP, Rule 209 prevails as federal law.

CBE alleges that facility equipment was altered. Complaint, ¶¶ 140–143. Defendants do not challenge these allegations or the proposition that under Rule 209, "when equipment which has been granted a per-

mit is altered ... the permit shall become void." Therefore, CBE states a claim for violation of Rule 209.

#### b. *Rule 806*

■ According to CBE, the version of District Rule 806 that has actually been approved into the SIP states that:

> no order for abatement shall be granted unless the [SCAQMD] hearing board makes all the following findings: That the respondent is in violation of section 41700 or 41701, Health and Safety Code, or of any rule or regulation of the Air Pollution Control Board.

CBE alleges that SCAQMD violated Rule 806 by issuing a stipulated abatement order to a party that had not violated any order, rule or regulation, Cenco. CBE alleges that at the time of the abatement order, only Powerine had permits for the facility; any violations were Powerine's; and Cenco "could not have been in violation of any code, rule or regulation at the time of the hearing or entry of order for abatement..." Complaint, ¶ 158.[8] SCAQMD states that there has been no Rule 806 violation because under amended Rule 806(b) and Cal. Health & Safety Code § 42451(b) stipulated abatement orders are permitted even when no specific violations have not been found. CBE contends that the version of Rule 806 SCAQMD relies on has not been enacted into the SIP and neither has Cal. Health & Safety Code § 42451(b); therefore, it argues, the SIP-enacted Rule 806 prevails and clearly requires finding an existing violation.

■ The Court finds that CBE states a violation of Rule 806. The 1988 amended Rule 806 appears not to have been approved into the SIP. The version of Rule

---

**8.** At first blush, CBE's allegations seem odd. They appear to allege that Cenco wrongly accepted responsibility for the pollution of Powerine. Why CBE considers such an act wrong is not clear. The FAC does not specify why Cenco would agree to such an abatement order.

806 that is part of the SIP enforceable under the Clean Air Act requires a finding of an existing violation for an abatement order to be issued.[9] Moreover, the unenacted version of 806 and section 42451 allow abatement orders in the absence of findings of violations, but only for persons accused of violations. Taking plaintiff's allegations as true, Cenco could not properly have been even accused of a violation; the provisions defendants rely on offer them no support.

### E. Exhaustion of Administrative Remedies

■ SCAQMD and Cenco argue that plaintiff's suit should be barred because CBE failed to exhaust available administrative remedies. Under California Health & Safety Code § 42302.1, plaintiff could have appealed SCAQMD's issuance of the Powerine operator's permit to Cenco within 30 days of the issuance. The Court rejects defendants' contention for the following reasons.

■ (1) Defendants do not dispute that pursuant to the CAA, CBE gave the required 60–day notice of its intended suit to the Administrator, the State of California and all defendants, including SCAQMD. The purposes of the notice requirement are to: (a) allow the alleged violator to come into compliance with the law; (b) provide an opportunity to negotiate a settlement of the dispute short of a lawsuit; and (c) give state and federal environmental agencies an opportunity to step in and enforce their laws and regulations. *Hallstrom v. Tillamook County,* 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989). These are largely the same purposes of requiring exhaustion of administrative remedies. *McKart v. United States,* 395 U.S. 185, 194–95, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Courts have held that such notice provisions in Citizen Suit statutes satisfy an exhaustion requirement. *See American Canoe Ass'n v. U.S. EPA,* 30 F.Supp.2d 908, 921–22, n. 16 (E.D.Va. 1998) (in Clean Water Act case with similar citizen suit provision and notice requirement court found that "Given the plaintiffs' compliance with the 60–day notice provision, which gave EPA actual notice of the claims and time in which to act upon them, they have exhausted all administrative procedures required or available under the Clean Water Act").

(2) Neither of the state law provisions which defendants assert create the opportunity for administrative review of permitting decisions have been enacted into the SIP. Therefore nothing in the Clean Air Act or the federally mandated SIP provides for state-based administrative remedies or their exhaustion. *See League to Save Lake Tahoe,* 598 F.2d at 1174 (after finding failure to state a claim, opining that plaintiff's "failure to pursue [administrative remedies] does not now entitle them to a remedy in a federal forum" but noting that administrative review procedures were set forth as part of the federally enacted SIP).

(3) The primary case relied on by defendants, *Trounday,* found merely that because plaintiffs had abdicated their administrative remedy by failing to timely pursue it, this did not entitle them to pursue a remedy in federal court, in the absence of jurisdiction. *Id.* at 1174 (after finding failure to state a claim, opining

---

**9.** SCAQMD relies on a 1978 California state case for its assertion that it properly amended Rule 806 in 1988 under the California Health & Safety Code. *People v. A–1 Roofing,* 151 Cal.Rptr. 522, 87 Cal.App.3d Supp. 1, 10–11 (1978). This case did not address federal citizen suits or even mention the Clean Air Act. SCAQMD ignores that states may not amend a SIP through the enactment of subsequent state law. *Deukmejian,* 731 F.Supp. at 1455–56; *NRDC v. EPA,* 478 F.2d 875, 888 (1st Cir.1973).

that plaintiff's "failure to pursue [administrative remedies] does not now entitle them to a remedy in a federal forum").

 Although Cenco may be correct that it is within this Court's discretion to bar CBE's suit for failure to exhaust, the Court need not apply the bar, and under the circumstances here, declines to do so.[10]

### F. Abstention

 SCAQMD argues that this Court should abstain from deciding the issues in this suit because it is not yet ripe. As SCAQMD points out, Cenco has filed a suit in the Court of Appeals for the District of Columbia Circuit challenging the EPA "reactivation policy" which allegedly formed the basis for EPA's NOV to Cenco. In that suit Cenco asserts that EPA's "reactivation policy," which requires new source review for all facilities that reopen after being shut down for more than two years with an intent to permanently close, was invalidly promulgated. SCAQMD Motion, p. 10. SCAQMD asserts that CBE's suit here will not be ripe until the D.C. Circuit rules on the validity of the "reactivation policy" because "the reactivation policy is the only basis plaintiff asserts for requiring Cenco to undergo New Source Review." SCAQMD Motion, p. 10.

CBE responds that this Court may and should proceed to adjudicate this suit because: (1) if one of the cases should be stayed, it should be the D.C. Circuit suit because it was filed six weeks after CBE's suit here; and (2) resolution of the D.C. Circuit suit would do nothing to resolve this case because the EPA's reactivation policy is *not* the only basis for plaintiff's claims; rather, the reactivation policy is consistent with and supports CBE's causes of action, all of which are premised on specific violations of SIP provisions.

The Court will not stay this suit pending the D.C. Circuit's decision. The suit is perfectly ripe: the issuance of the permit that CBE challenges is completely final. Moreover, CBE's suit is not expressly premised on any informal "reactivation policy." It instead alleges that new source review was required for the Cenco facility because Rule 209 voided Powerine's previous permits. Finally, as plaintiff points out, even if these suits did involve identical issues, this suit was filed first; SCAQMD has not made a showing sufficient to depart from the first-to-file rule.

### G. Supplemental State Law Claims

 In addition to its CAA claims against Cenco and SCAQMD, CBE asserts five causes of action against the City of Santa Fe Springs for violations of the state statute, CEQA. *CBE's Ninth Cause of Action* asserts that the City violated CEQA by failing to consult with the EPA during the EIR process and by failing "to consider the effects of the permitting process that the U.S. EPA has indicated the refinery will have to go through under the CAA and NSR contained in the California SIP." Complaint, ¶¶ 246–47. *The Tenth Cause of action* asserts that the City violated CEQA by failing to consider and include in the administrative record documents submitted during the EIR process, including the EPA NOV to Cenco. *The Eleventh Claim* states that the City violated CEQA by failing to impose feasible mitigation measures to reduce significant effects of the Upgrade Project. *Claim Twelve* asserts that the City failed to provide notice

---

10. The Court also rejects SCAQMD's argument that CBE was required to "exhaust state judicial remedies" before filing suit in federal court. "It would defeat the purpose of Congress for a court to hold that assertion of a federal claim in federal court must await an attempt to vindicate the same claim in state court." *Oregon Environmental Council,* 775 F.Supp. at 364.

of public hearings and environmental documents on its web page. *CBE's Thirteenth* and final cause of action asserts that the City violated CEQA by approving conditional use permits inconsistent with the California SIP (based on the EPA's NOV) and the City's general plan.

### a. Common Nucleus of Operative Facts

The City moves to dismiss CBE's Ninth through Thirteenth pendent state law causes of action against it for lack of supplemental jurisdiction under 28 U.S.C. § 1367. The City asserts that these causes of action and CBE's CAA claims do not derive from a common nucleus of operative facts because the CAA claims challenge SCAQMD's reactivation and transfer of Powerine's facility operator permit to Cenco in December 1998 and January 1999 while the CEQA claims challenge the City's approval of Cenco's Refinery Project in July 2000. The City asserts that although CBE includes in its state claims allegations that the City failed to properly integrate CAA requirements into its own analysis, CBE has merely confused different jurisdictions and permitting authorities. Moreover, the City states that the Court should not exercise supplemental jurisdiction over the CEQA claims because differing standards of review would preclude the CEQA and CAA claims from being tried together.

CBE responds that both sets of claims arise from the same operative facts: "Cenco wants to build and operate a refinery on the site that contains an aging and partially dismantled oil refinery that was shut down in 1995." CBE Opposition, p. 50. CBE adds that its causes of action are in part "derivative of and intertwined with whether defendants satisfied the federal Clean Air Act requirements" and that "the evidence involved in the federal and state claims is substantially the same in scope and source." *Id.* Finally, CBE contends

that to the extent that the City relies on the fact that different legal standards may apply to the different sets of claims, the City misinterprets supplemental jurisdiction by demanding "a common nucleus of operative law," rather than fact.

It is true that the reactivation and transfer of the Powerine permit that forms the basis of the CAA claims happened at a different times and involved a different agency than the approval of the Refinery Project and issuance of the CUPs at the heart of the CEQA claims. However, both sets of claims do arise generally from "the restart and building of the facility." Moreover, plaintiff's state law claims do *arise from* the permitting violations forming the basis of the federal claims, in that allegedly the City violated CEQA by failing to properly acknowledge potential CAA and SIP violations. This is especially so in the Thirteenth Cause of Action, which appears to depend squarely on the SIP violations that form the basis of the CAA claims; it asserts that the Refinery Project is inconsistent with the SIP for the same reasons that SCAQMD's issuance and approval of the transfer of the Powerine permit are inconsistent with the SIP.

Based on the factual and legal interrelation of the claims, the Court declines to dismiss CBE's supplemental claims under § 1367. The gist of CBE's Ninth, Tenth and Thirteenth claims is that SCAQMD's errors were compounded by the City. Plaintiff's allegations demonstrate a common nucleus of operative fact. If the City wishes to move to dismiss plaintiff's claims on the ground, asserted in its brief, that the City was "entitled to rely on the SCAQMD as a responsible agency," City Motion, p. 8, they may do so. However, the City has moved to dismiss the state claims only on the basis of 28 U.S.C. § 1367(a) and under that section the City's

arguments do not justify finding an absence of supplemental jurisdiction.

### b. Failure to Join a Party Under Rule 19

 The City alternatively argues that the state claims should be dismissed for failure to join an indispensable party to the state claims, namely Cenco. The City argues, and CBE does not dispute, that Cenco is a necessary party to the state law claims because adjudication in CBE's favor would preclude Cenco from pursuing its construction plans. The City adds, and CBE also does not dispute, that the statute of limitations to add Cenco as a party has run. The City argues that since Cenco's interests cannot properly be represented in its absence, that the Ninth through Thirteenth claims must be dismissed.

The central issue is whether the failure to include Cenco in the heading of each of the state law claims, notwithstanding the inclusion of Cenco in the action generally, means that Cenco has not been named for Rule 19 purposes.

The City's argument is strained. Cenco is and has been a named party to this suit from its inception. Although Cenco's name is not present in the headings to the state law claims, Cenco is in the complaint's caption, is described in detail in the "Parties" section of the complaint, the state law claims incorporate by reference all previous paragraphs in the complaint, and the prayer for relief to the state law claims requests that the Court issue injunctions to enjoin "Defendants" and specifically "Cenco" from taking any further action to implement the Refinery Expansion Project. Complaint, ¶¶ 27, 38–39, 238, 254, 261, 281, 293, p. 61 ¶ 12(C).

Even if on these facts, CBE has not satisfied the requirements of Rule 19, it is not clear [11] why under FRCP 15(c) an amendment to allege the state law claims "against Cenco" would not relate back to the date of the original complaint, and therefore overcome any statute of limitations problem. *Federal Civil Procedure Before Trial*, 8–92.11 ("Moreover, where the original complaint asserts different claims against different defendants, *each defendant is on notice of claims asserted against other defendants* and therefore may be named in an amended pleading.") (citing *Martell v. Trilogy*, 872 F.2d 322 (9th Cir.1989)) (emphasis in original).

The Court declines to dismiss CBE's state law claims under Rule 19.

### IV. CONCLUSION

For the foregoing reasons and good cause appearing therefor, the Court DENIES defendants' motions to dismiss.

IT IS SO ORDERED.

---

11. The parties have not raised this issue.